UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lonnie R. Berryman, Jr., individually and as a representative of the Class, | |
| Plaintiff, | CASE NO.: 3:21-cv-1651 |
| v. | **JURY TRIAL DEMANDED** |
| Avantus, LLC, | Date: December 13, 2021 |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Lonnie R. Berryman, Jr. ("Plaintiff" or "Mr. Berryman"), who is a living, breathing consumer, brings this Class Action Complaint against Avantus, LLC ("Defendant" or "Avantus"), on behalf of himself and the class set forth below:

**INTRODUCTION**

1. This is a class action for violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, against a consumer reporting agency that falsely reports that consumers are deceased, even when it has clear evidence in its possession that the individuals in question are very much alive. This reporting has devastating consequences for individuals who are misreported as dead. Credit bureaus will not issue credit scores on deceased consumers, meaning that someone who is being falsely reported as deceased is unable to obtain credit. This problem is especially consequential for consumers who are seeking to obtain mortgage financing.

2. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology allows information concerning individual consumers to flow instantaneously to requesting parties.

1

Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should benefit from the resulting convenience and efficiency.

3. However, this information has also become available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage when inaccurate information is disseminated about them.

4. The technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are known as consumer reporting agencies ("CRAs").

5. The "Big Three" major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

6. The Big Three sell credit information to paying subscribers (i.e., lenders, retailers, landlords, potential employers, and others), concerning individuals who may be applying for a mortgage, other credit, housing, or employment.

7. The Big Three also sell credit information to "reseller" CRAs, such as Defendant Avantus, who assemble and merge the credit information obtained from each of the Big Three into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report. Defendant combines this information, adds its own summary of the Big Three's data, and then sells the completed report to mortgage lenders throughout the country.

8. In the parlance of the FCRA, both the information sold by the Big Three to the resellers and the information sold by resellers to the resellers' customers constitute "consumer reports." 15 U.S.C. § 1681a(d).

9.     Lenders use tri-merge reports because they want to review credit information from all of the Big Three to ensure that they do not make loans based on an incomplete picture of the credit applicant's financial position.

10.     Lenders who use tri-merge reports rely on credit scores generated by running standard algorithms against *each* of the Big Three's credit files. Tri-merge reports often contain three credit scores (one for each of the Big Three), with the difference in scores being accounted for by variations among each of the Three's data (as well as differences in the scoring algorithm of each).

11.     Since 1970, when Congress enacted the FCRA, federal law has required all CRAs, including resellers like Defendant, to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile, assemble, merge, and sell about individual consumers. 15 U.S.C. § 1681e(b).

12.     One of the primary purposes in requiring CRAs and resellers to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

13.     The preservation of consumers' good names and reputations is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible*

*destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

14. In light of these findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

15. This class action seeks statutory and punitive damages, costs, and attorneys' fees for Plaintiff and the class against Defendant Avantus for its willful violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, by inaccurately reporting that Plaintiff and members of the class were deceased.

## THE PARTIES

16. Plaintiff Lonnie R. Berryman, Jr. ("Plaintiff" or "Mr. Berryman") is a natural person who lives in Milton, Florida and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17. Defendant Avantus, LLC ("Defendant" or "Avantus"), is a limited liability company with a principal place of business located at 600 Saw Mill Road, West Haven, CT 06510-4044, and is authorized to do business in the State of Connecticut, including within this District.

18. Avantus is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Avantus is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

4

19. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

*Plaintiff's Experience*

21. In early 2021, Plaintiff and his wife sold their home, moved in with relatives, and sought pre-approval for financing of a new home.

22. With their eye on several homes they hoped to put offers on, on February 13, 2021, Plaintiff and his wife applied jointly for pre-approval for a home mortgage loan with Trident Home Loans, LLC ("Trident").

23. Initially, a representative of Trident quoted Plaintiff $150,000-$185,000 for a pre-approved home mortgage loan. Elated with this offer, Plaintiff and his wife were eager to finalize the pre-approval process.

24. Trident obtained all of Plaintiff and his wife's personal identification information, including their accurate Social Security numbers, and informed Plaintiff and his wife that Trident needed to obtain their credit reports from Equifax, Experian, and Trans Union in order to determine if it could pre-approve them for the home mortgage loan. That same day, on February 13, 2021, Avantus purchased Plaintiff's credit files from Equifax, Experian, and Trans Union and assembled and merged their credit information into a credit report, which it sold to Trident.

25. The credit report prepared by Avantus showed Equifax was reporting Plaintiff as "deceased" with no credit score.

26. Based on the "deceased" notation reported by Equifax, Trident denied Plaintiff's home mortgage loan application.

27. The credit report that Avantus sold to Trident was patently inconsistent—it contained Plaintiff's Experian and Trans Union credit scores but did not contain a credit score from Equifax and, instead, stated that his credit file was not scored because he was deceased.

28. In addition to reporting credit scores from Experian and Trans Union, the Avantus report also included data from Experian and Trans Union regarding Plaintiff's current employment, address and payment history – all of which should have alerted Defendant that Plaintiff was very much alive.

29. Defendant made no effort to determine whether Plaintiff was in fact deceased prior to publishing its report. Defendant could have easily reached out to Plaintiff and allowed him to prove he was alive through the submission of basic documentation. Defendant could have also reached out to the Big Three to resolve the inconsistencies in the information it received.

30. Plaintiff takes great pride in his good name and established credit rating, so he works hard to ensure that his bills are paid in-full and on-time every month. He believes and understands that his credit record with all of his creditors is excellent, so Plaintiff could not imagine what the problem could be when he received Trident's denial.

31. Much to Plaintiff's shock and dismay, his financing was halted by Trident because Plaintiff's tri-merge credit report indicated that he was "deceased" and had no Equifax credit score.

32. Trident informed Plaintiff that he would need to try and remedy this issue before they could move forward with the pre-approval process.

33. Plaintiff pleaded with Trident that this deceased notation was an obvious mistake, but his pre-approval application was ultimately denied.

34. As a result of the "deceased" notation, Avantus made it practically impossible for Plaintiff to obtain credit. Doing so made it impossible for Plaintiff and his wife to make offers on homes that interested them – homes that quickly left the market – and extended the time which Plaintiff and his wife had to live with relatives.

35. As a result of Defendant's conduct, Plaintiff has suffered concrete financial and pecuniary harm arising from monetary losses relating to credit denials, loss of use of funds, loss of credit and loan opportunities, out-of-pocket expenses, and other related costs.

**Avantus' Process of Assembling and Merging Consumers' Credit Information into Tri-Merge Credit Reports**

36. The Big Three national CRAs (Equifax, Experian, and Trans Union) regularly receive information from various sources around the country, including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others. These sources are known as "furnishers" within the credit reporting industry and under the FCRA. *See* 12 CFR § 1022.41.

37. The Big Three collect information from thousands of furnishers and distribute that information to their many subscribers, including Defendant Avantus.

38. Avantus' customers, in turn, use that information to make decisions as to whether to extend credit to a particular consumer and for other purposes permitted under the FCRA.

39. The process by which the Big Three receive, sort, and store information is largely electronic.

40. The Big Three take the credit, public record, and other information reported by furnishers and use it to create consumer credit files.

41. The Big Three maintain credit files on more than 200 million consumers.

42. When Avantus requests credit information from the Big Three for a particular consumer, the Big Three send raw credit data to Avantus electronically.

43. After receiving the raw credit data from the Big Three for a particular consumer, Avantus assembles, merges, normalizes, and summarizes that data into a tri-merge credit report.

44. As far as Avantus is concerned, accuracy means outputting the same credit data that it received from the Big Three without alteration.

45. Avantus does nothing to ensure that the credit information it receives is, in fact, accurate.

46. Avantus does not analyze the accuracy of the underlying credit data it receives from the Big Three in any way, but merely accepts it at face value.

47. Avantus does not take any action to determine if the information it receives from one of the Big Three is facially incompatible with information received from another of the Big Three.

48. Avantus does not employ reasonable procedures to assure the maximum possible accuracy of the credit information it includes in the tri-merge credit reports it sells to mortgage lenders throughout the country.

**Avantus' Practices Concerning the Sale of Reports on the "Deceased"**

49. Avantus sells thousands of tri-merge credit reports each year, and also sells credit scores.

50. Avantus sells tri-merge credit reports and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

51. Pursuant to 15 U.S.C. § 1681e(b), Avantus is required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

52. Avantus routinely sell credit reports for *living* consumers with active credit histories, which include a notation indicating that the *living* consumer is "deceased" and therefore does not have a credit score.

53. Avantus does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" notation on that consumer's tri-merge credit report.

54. Avantus does not employ any procedures *at all* to assure that a consumer with a "deceased" notation on their tri-merge credit report is, in fact, actually deceased before including the "deceased" notation on that consumer's report and selling that report for profit.

55. Even in instances where other data on the face of the consumer's tri-merge report indicates that the consumer is alive, such as a current and active credit history, Avantus employs no procedures to assure that a consumer with a "deceased" notation on their report is, in fact, actually deceased before including the "deceased" notation in that consumer's file.

56. That is, when it receives information from one of the Big Three that a consumer is deceased, and information from another of the Big Three that is incompatible with that information – such as an active credit score (indicating the other agency does not believe the consumer is deceased), and open accounts with a very recent payment history – Defendant makes no investigation.

57. Once a "deceased" notation is included in a consumer's report from one of the Big Three, Avantus cannot provide a credit score for that consumer for that member of the Big Three.

58. Instead, when Avantus sells a report with a "deceased" notation to a third party, it reports that consumer's credit score as "N/A," for that member of the Big Three, while simultaneously providing scores based on the data from the other of the Big Three.

59. Avantus knows that third-party credit issuers require a credit score from *all* of the Big Three in order to process a given credit application.

60. Avantus also knows that consumers without credit scores from *all* of the Big Three are unable to secure credit from most credit issuers.

61. Avantus also knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

62. Avantus has been put on notice through consumer disputes that living, breathing consumers are turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

63. Nevertheless, Avantus has an automated process in place that accepts all credit data received from the Big Three as accurate and employs no procedures to assure that a consumer marked as "deceased" by at least one of the Three on their tri-merge credit report is, in fact, deceased.

64. Avantus has no independent procedure to change an erroneous deceased status on its own and merely parrots the credit information it receives from the Big Three.

## CLASS ACTION ALLEGATIONS

65. <u>The Class</u>: Plaintiff brings his claims on behalf of himself individually, and, pursuant to Fed. R. Civ. P. 23, on behalf of a Class, defined as follows:

> All natural persons who were the subject: (1) of a consumer report furnished by Defendant to a third party within the two years preceding the filing date of this Complaint; (2) where the consumer report contained a notation that the consumer was deceased from at least one of Experian, Equifax or Trans Union; (3) where at

10

least one other of Experian, Equifax or Trans Union did not contain a deceased notation; and (4) where the consumer was not deceased at the time the report was issued.

66. The Class satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

67. <u>Numerosity</u>: The Class is so numerous that joinder of the claims of all class members is impractical. Membership in the Class can be ascertained though Defendant's records.

68. <u>Existence and Predominance of Common Questions of Law and Fact</u>: Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant blindly includes whatever information it obtains from the Big Three into its reports without any procedure to assure the accuracy or completeness of the underlying data; (b) whether this conduct violated the FCRA; and (c) whether the violations were willful, reckless, knowing, or intentionally committed in conscious disregard of the Plaintiff's and class members' rights.

69. <u>Typicality</u>: Plaintiff's claims are typical of the claims of each class member and all claims are based on the same facts and legal theories. Plaintiff, as every class member, alleges violations of the same FCRA provision, 15 U.S.C. § 1681e(b). The claims challenge the Defendant's consumer reporting procedures and does not depend on any individualized facts. For purposes of class certification, Plaintiff seeks only statutory and punitive damages. Such damages are appropriate in circumstances like this one where injuries are particularized and concrete, but difficult to quantify, rendering the recovery of class statutory damages ideal and appropriate.

70. <u>Adequacy</u>: Plaintiff will fairly and adequately protect the class members' interests. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor his counsel have any interests that might cause

them not to vigorously pursue this action. Plaintiff is aware of his responsibilities to the Class and has accepted such responsibilities.

71. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

    a. As alleged above, the questions of law or fact common to the class members predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. The statutory and punitive damages sought by each member are such that the individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.

    b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are unable to afford and bring such claims individually. Further, most consumers affected by Defendant's conduct are likely unaware of their rights under the law. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are class-wide and should be resolved at one time.

**CLAIM FOR RELIEF**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(On behalf of Plaintiff, individually, and on behalf of the Class)**

72. Plaintiff re-alleges and incorporates the allegations set forth above as if fully stated herein.

73. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

74. Defendant prepared patently false consumer reports concerning Plaintiff and class members, incorrectly indicating that they were deceased.

75. Defendant assembled, merged, and resold patently false consumer reports concerning Plaintiff and class members, incorrectly indicating that they were deceased.

76. Despite actual and implied knowledge that Plaintiff and the class members were not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff and class members, and their creditworthiness.

77. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to ensure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff and class members.

78. As a result of Defendant's conduct, Plaintiff and the Class suffered concrete harm including but not limited to financial harm, harm to credit opportunities and reputational harm.

79. Defendant's violation was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

80. Defendant's conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendant's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that other CRAs have been subject to court decisions and consumer complaints critical of similar conduct; and Defendant will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports with facial inconsistencies than engaging in the basic due diligence that would result in producing accurate reports.

81. Plaintiff and class members are entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for relief as follows:

a) Determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3);

b) Designating Plaintiff as the representative for the Class;

c) Designating Plaintiff's Counsel as counsel for the Class;

d) Issuing notice to the Class at Defendant's expense;

e) Declaring that Defendant committed multiple, separate violations of the FCRA;

f) Declaring that Defendant acted willfully and in deliberate or reckless disregard of the rights of Plaintiff and the Class under the FCRA;

g) Awarding statutory damages as provided by the FCRA;

h) Awarding punitive damages as provided by the FCRA;

i) Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA; and

j) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

82. Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues triable by a jury.

Dated: December 13, 2021

/*Jeffrey Gentes*/
Jeffrey Gentes (ct28561)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT 06106
(860) 263-0741
jgentes@ctfairhousing.org

E. Michelle Drake*
Joseph C. Hashmall*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jhashmall@bm.net
* *pro hac vice* forthcoming

*ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS*